IN THE UNITED STATES DISTRICT COURT

RECEIVED

FOR THE MIDDLE DISTRICT OF ALABAMA

2026 MAR -2 P 1: 04

EASTERN DIVISION

| | | |
|---|---|---|
| HOPE R. MILLER, | ) | |
| Plaintiff, | | |
| | ) | CASE NO. |
| | | 3:25-cv-00623-RAH |
| v. | ) | |
| TRANS UNION LLC, | ) | |
| Defendant. | | |

SECOND AMENDED COMPLAINT

*(Filed Pursuant to Court Order Doc. 32, February 19, 2026)*

PRELIMINARY STATEMENT

***Compliance with Doc. 32.*** Plaintiff Hope R. Miller respectfully submits this Second Amended Complaint in full compliance with the Court's Order dated February 19, 2026 (Doc. 32). The Court's Order directed three actions: (a) severance of the three Plaintiffs' claims into individual cases; (b) removal of allegations and claims advanced by Plaintiffs Raheem Sanders and Diyana Mathis; and (c) dismissal of all claims premised upon blank data information fields. This complaint addresses only Plaintiff Miller's individual claims. No allegations or claims of any

1

other Plaintiff are asserted. No claims premised upon blank data information fields are asserted in this complaint. The surviving claims asserted herein are limited to: (i) fabricated "Last Payment Made: 08/26/2023" dates contradicted by Trans Union's own $0 payment data (§1681e(b)); (ii) false 120-day delinquency codes on accounts Trans Union's own header fields report as Current, Deferred, with $0 Monthly Payment (§1681e(b)); (iii) dissemination of fabricated and false data to nineteen creditors (§1681e(b)); (iv) reinvestigation failures including timeline violations, verification of impossible data, and failure to delete unverifiable information (§1681i); (v) deceptive trade practices under the Alabama Deceptive Trade Practices Act; and (vi) defamation per se with malice under the §1681h(e) exception. To the extent any reference herein to monetary fields, payment grids, or field-level data appears, such references are made solely as evidence of the falsity of the fabricated payment dates and false delinquency codes that constitute the basis of Plaintiff's surviving claims—not as independent claims premised upon the blank or incomplete status of those fields, which claims remain dismissed pursuant to Doc. 32.

***Correction of Prior Pleading Deficiencies.*** The Court found the prior pleadings to be "lumped together in a shotgun fashion" and "difficult and confusing to consider." Doc. 32 at 4. This Second Amended Complaint cures those deficiencies. Each factual allegation is stated in its own numbered paragraph, limited to a single set of circumstances as required by Federal Rule of Civil Procedure 10(b), and structured to permit Defendant to admit, deny, or state insufficient knowledge as to each allegation with specificity under Rule 8(b). The numbered paragraphs contain only factual allegations requiring a response. Legal standards, damages analysis, and incorporation clauses are set forth in unnumbered paragraphs. Defendant's Answer must address each numbered paragraph individually. Rule 8(b)(6).

2

*Scope of Claims.* All claims asserted herein were contained in the First Amended Complaint (Doc. 29), which the Court allowed as filed except for the claims based on blank data information fields. Doc. 32 at 4 ("the First Amended Complaint (doc. 29) is ALLOWED as filed except for the claims based on the blank information fields"). This Second Amended Complaint does not add new claims; it reorganizes the allowed claims into a clear, individually-stated format with proper count headings as the Court's severance order contemplates. No claim in this complaint is premised upon the blank or incomplete status of any data information field. Every claim traces to fabricated payment dates, false delinquency codes, or reinvestigation failures—not to the status of any data field.

## PARTIES

1. Plaintiff Hope R. Miller ("Miller") is a natural person and citizen of the State of Alabama, residing at 404 Brown Street, Tuskegee, Alabama 36083. Her TransUnion File Number is 460943677. Miller is a Certified Pharmacy Technician with twenty-three years of continuous employment in the healthcare industry, including positions at Walgreens, DCH Regional Medical Center, Prime Therapeutics, and other healthcare institutions. Miller holds an Associate's Degree in Computer Technology from the University of Phoenix (2012). Miller served as Co-Owner and Manager of Midwest Flava LLC, a family restaurant that operated from July 2024 until its closure in August 2025. The closure was a direct and proximate result of the inability to secure adequate financing, which in turn was caused by Trans Union's fabricated credit reporting as set forth herein.

3

2. Defendant Trans Union LLC ("Trans Union") is a Delaware limited liability company with its principal place of business at 555 West Adams Street, Chicago, Illinois 60661. Trans Union is a consumer reporting agency as defined by 15 U.S.C. § 1681a(f). Trans Union is a founding member of the Consumer Data Industry Association ("CDIA"). Trans Union served on the Metro 2® Task Force that developed the Metro 2® Format. Trans Union participated in drafting the Credit Reporting Resource Guide® ("CRRG"). Trans Union regularly conducts business throughout the Middle District of Alabama.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) because this action arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* Plaintiff has Article III standing because Trans Union's publication of fabricated credit data to third-party creditors constitutes a concrete injury bearing a "close relationship to the harm associated with the tort of defamation." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021); see also *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (requiring "concrete" injury for Article III standing; injury need not be "tangible").

4. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a) because those claims arise from the same nucleus of operative facts as the federal claims.

5. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

A. *Federal Student Loan Payment Suspension Under the CARES Act*

6. On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281, mandated the automatic suspension of all federal student loan payments: "The Secretary shall suspend all payments due for loans made under part D and part B (that are held by the Department of Education) of title IV of the Higher Education Act of 1965 (20 U.S.C. 1087a et seq.) through September 30, 2020." CARES Act § 3513(a)(1). The payment suspension was extended by subsequent executive action through September 30, 2023—forty-three months of mandatory federal deferment affecting approximately 43 million borrowers. No borrower action was required. No servicer discretion was permitted. Trans Union, as a consumer reporting agency that maintained credit files on the affected borrowers, was subject to this mandate from the date of enactment.

7. Section 3513(d) of the CARES Act mandated specific credit reporting treatment: "The Secretary shall ensure that, for the purpose of reporting information about the loan to a consumer reporting agency, any payment that has been suspended under this section is treated as if it were a regularly scheduled payment made by the borrower." Suspended payments must be treated "as if" they were payments made—meaning Amount Past Due must equal $0, and the account must reflect Current status with appropriate deferment coding. Trans Union possessed actual knowledge of this federal mandate through multiple channels: (a) the statutory text itself; (b) the Interagency Statement on Loan Modifications and Reporting for Financial Institutions Working With Consumers

5

Affected by the Coronavirus, issued jointly by the FFIEC, CFPB, and federal banking regulators on March 22, 2020—five days before the CARES Act was signed into law—which specifically addressed credit reporting obligations during COVID-19 accommodations; and (c) CDIA's own April 2, 2020 guidance to data furnishers on CARES Act reporting compliance, which Trans Union, as a founding CDIA member, helped develop and distribute. Trans Union knew how to report suspended student loan payments correctly because Trans Union helped write the industry guidance on how to do so.

8. Trans Union reported a "Last Payment Made: 08/26/2023" date on Miller's federal student loan tradelines. This date falls within the CARES Act mandatory deferment period (March 2020 through September 2023). During this period, no payments were due on Miller's federal student loans by operation of federal law. Trans Union's fabrication of a payment date during a period when federal law prohibited payment obligations is not merely inaccurate—it is categorically impossible. Where a consumer reporting agency publishes such fabricated data to third-party creditors, the resulting harm bears a "close relationship to the harm associated with the tort of defamation." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021). The FCRA "requires not just technical accuracy, but also for the report to not be misleading or incomplete." *Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1280 (11th Cir. 2017). Trans Union reported a payment date during a period when the borrower owed no payment, was required to make no payment, and—by operation of federal law—could not have been expected to make a payment.

B. *Congressional and Judicial Notice of Systematic Credit Reporting Failures*

6

9. On May 20, 2020—less than two months after the CARES Act's enactment—a class action was filed against Trans Union in the Northern District of California for misreporting the status of federal student loans under the CARES Act. See Sass v. Great Lakes Educ. Loan Servs., Inc., No. 4:20-cv-03371 (N.D. Cal. May 20, 2020) (class action complaint naming Trans Union as defendant for CARES Act student loan misreporting). On August 8, 2024, United States Senators Elizabeth Warren, Jeffrey A. Merkley, Ron Wyden, and Richard Blumenthal sent formal correspondence directly to Trans Union's President and CEO, Christopher A. Cartwright, at Trans Union's principal place of business—555 W. Adams Street, Chicago, Illinois 60661—the same address identified in ¶2 above. See Letter from Sen. Elizabeth Warren et al. to Christopher A. Cartwright, President & CEO, TransUnion (Aug. 8, 2024) (the "Warren Letter"), available at https://www.warren.senate.gov. The Senators wrote "in light of alarming reports" that Trans Union and other credit reporting agencies had "collectively mishandled" student loan reporting, "causing at least 1.4 million duplicate student loan records to appear on borrowers' credit reports, reducing their credit score and their ability to obtain mortgages, car loans, and any other credit." Warren Letter at 1. The Senators stated that "the credit reporting agencies also likely bear some responsibility for these ongoing problems" and characterized the collective conduct of Trans Union and the other credit reporting agencies as "disgraceful." Id. at 2–3. Trans Union, through the Consumer Data Industry Association, publicly acknowledged that its "members were aware some consumers faced issues" with student loan credit reporting. CNBC, Dec. 19, 2024.

10. Trans Union received the Warren Letter at 555 W. Adams Street, Chicago, Illinois 60661—the same address identified in ¶2 above—no later than August 8, 2024. As of

that date, Trans Union's CEO, Christopher A. Cartwright, possessed actual notice that four United States Senators had identified the precise category of student loan credit reporting failures alleged herein. Despite this notice, the fabricated "Last Payment Made: 08/26/2023" dates on Miller's tradelines remained uncorrected. Trans Union took no corrective action on any of Miller's tradelines at any time between August 8, 2024 and the date of this filing—a period of approximately eighteen months. See *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007) (willfulness includes "reckless disregard of statutory duty"); see also *Williams v. First Advantage LNS Screening Sols.*, 947 F.3d 1298, 1309 (11th Cir. 2020) (affirming punitive damages where consumer reporting agency described compliance as "kind of aspirational").

**C. *Applicable Industry Standards: The Metro 2® Format and Credit Reporting Resource Guide***

11. The Metro 2® Format is the industry-standard data specification for furnishing consumer credit information to consumer reporting agencies. The format is maintained by the Consumer Data Industry Association ("CDIA") and published in the Credit Reporting Resource Guide® ("CRRG"). The FCRA was enacted to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit . . . in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b); *Philbin v. Trans Union Corp.*, 101 F.3d 957, 962 (3d Cir. 1996). Trans Union did not merely receive these standards—Trans Union is a founding member of CDIA, served on the Metro 2® Task Force that developed the format, and participated in drafting the CRRG itself.

12. The CRRG establishes mandatory programming standards at Section 3-3, including: "Every numeric field is right-justified and zero filled;" "If a numeric field is not available, it should be zero filled;" and "If a monetary field is not applicable, it should be zero filled." CRRG at 3-4. The CRRG concludes this section with an unambiguous warning: "Any deviation from these standards jeopardizes the integrity of the data." CRRG at 3-4. Trans Union helped found the organization that published this warning and participated in drafting the document that contains it. Trans Union's knowledge of these standards is not constructive—it is actual. See *Williams*, 947 F.3d at 1309 (willfulness established where agency failed to follow its own internal procedures).

13. The CRRG specifies that Field 18 (Date of Last Payment) must correlate with Field 26 (Actual Payment Amount). A "Date of Last Payment" may only be populated when a corresponding non-zero payment appears in the payment history grid. This internal consistency requirement is fundamental to Metro 2® data integrity. Miller's fourteen tradelines each contain a Date of Last Payment of August 26, 2023 with no corresponding non-zero payment amount in any month on any account. A report that populates a payment date contradicted by its own $0 payment grid is "technically accurate but nonetheless materially misleading" and constitutes an "inaccuracy" under the FCRA. *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1313 (11th Cir. 2018).

14. The CRRG provides specific guidance for federal student loan reporting at Chapter 13 (Student Loan Reporting — Federal Loans). For loans in deferment or forbearance when no payments are due, the CRRG specifies: Terms Frequency = D (deferred); Scheduled Monthly Payment Amount = $0 (zero-filled); Account Status = 11 (Current); Amount Past Due = $0; and appropriate Special Comment codes including PDE (Payment

Deferred). CRRG at 13-4, 13-10. Trans Union co-authored these specific reporting requirements and is charged with knowledge of their content.

**D.** *Trans Union's Reporting of Plaintiff's Student Loan Tradelines*

15. Trans Union generated a consumer disclosure report for Miller bearing her TransUnion File Number. That report, produced by Trans Union's own data processing systems, contains fourteen DEPT OF ED/AIDV student loan tradelines (Account Prefix 95005683441E001 through E010, with origination dates between 2011 and 2015) with a combined reported balance of approximately $68,257. Each tradeline reports the identical fabricated data, as follows:

| # | Account Suffix | Last Pmt Reported | Aug 2023 Grid | Header: Mo. Pmt / Status |
|---|---|---|---|---|
| 1 | 95005683441E001 | 08/26/2023 | $0 paid | $0 / Deferred / Current |
| 2 | 95005683441E002 | 08/26/2023 | $0 paid | $0 / Deferred / Current |
| 3 | 95005683441E003 | 08/26/2023 | $0 paid | $0 / Deferred / Current |
| 4 | 95005683441E004 | 08/26/2023 | $0 paid | $0 / Deferred / Current |
| 5 | 95005683441E005 | 08/26/2023 | $0 paid | $0 / Deferred / Current |
| 6 | 95005683441E006 | 08/26/2023 | $0 paid | $0 / Deferred / Current |
| 7 | 95005683441E007 | 08/26/2023 | $0 paid | $0 / Deferred / Current |
| 8 | 95005683441E008 | 08/26/2023 | $0 paid | $0 / Deferred / Current |
| 9 | 95005683441E009 | 08/26/2023 | $0 paid | $0 / Deferred / Current |
| 10 | 95005683441E010 | 08/26/2023 | $0 paid | $0 / Deferred / Current |
| 11 | 95005683441E011 | 08/26/2023 | $0 paid | $0 / Deferred / Current |
| 12 | 95005683441E012 | 08/26/2023 | $0 paid | $0 / Deferred / Current |
| 13 | 95005683441E013 | 08/26/2023 | $0 paid | $0 / Deferred / Current |

| 14 | 950005683441E014 | 08/26/2023 | $0 paid | $0 / Deferred / Current |
|----|------------------|------------|---------|-------------------------|

See Doc. 15, Exhibit A-1 (complete TransUnion disclosure) and Doc. 29-1 (Exhibit B-1 to the First Amended Complaint) for complete account numbers, individual balances, and payment history grids. Every tradeline displays the same pattern: a fabricated "Last Payment Made: 08/26/2023" date alongside a $0 payment grid and header fields reporting Monthly Payment = $0, Terms = "Deferred," and Pay Status = "Current Account." Fourteen tradelines. Fourteen identical contradictions. Fourteen accounts on which Trans Union's own data proves that no payment was received on the date Trans Union reported a payment was made.

16. On each of the fourteen tradelines identified above, Trans Union reported "Last Payment Made: 08/26/2023" in the account header. Trans Union's own payment history grid for August 2023 shows Amount Paid = $0 on each of those same tradelines. A "Last Payment Made" date represents a date on which a payment was received. Trans Union's payment grid for that same month shows $0 received. These two data points—on the same tradeline, in the same report, generated by the same Trans Union systems—cannot both be accurate. Trans Union has not identified which of these two contradictory data points is correct. Trans Union has not explained how a payment date was populated when Trans Union's own payment grid recorded $0 received. The FCRA "requires not just technical accuracy, but also for the report to not be misleading or incomplete." *Pedro*, 868 F.3d at 1280. A consumer reporting agency must not present information "in a manner that is likely to mislead." *Erickson*, 981 F.3d at 1252. See Exhibit B-1.

17. Trans Union reported delinquency codes indicating 120-day past-due status on Miller's federal student loan tradelines for September through November 2018. Trans Union's

own payment grid for those same months reports $0 for Balance, $0 for Past Due, $0 for Amount Paid, and $0 for Scheduled Payment on each of those tradelines. Trans Union reported that Miller was 120 days past due while simultaneously reporting no balance owed, no past due amount, no payment received, and no payment scheduled on the same tradelines. A consumer cannot be 120 days delinquent on an account where every monetary field equals $0. These accounts were in deferment. Trans Union's own header fields—Monthly Payment = $0, Terms = "Deferred"—confirm that no payment was due. The delinquency codes are irreconcilable with Trans Union's own monetary data on the same tradelines. The FCRA "requires not just technical accuracy, but also for the report to not be misleading or incomplete." *Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1280 (11th Cir. 2017). A report that presents delinquency codes alongside $0 monetary fields is not merely incomplete—it is affirmatively misleading. See Exhibit B-1.

### E. *Fabrication of Payment Dates and Departure from Reporting Standards*

18. The evidence set forth in ¶¶15–17 above establishes that Trans Union's consumer report for Miller contains fabricated data. Specifically: (a) Trans Union's own payment history grid reports $0 paid for every month on every tradeline, yet Trans Union populated a "Last Payment Made: 08/26/2023" date on fourteen separate accounts; (b) Trans Union's own monetary data reports $0 for Balance, Past Due, Amount Paid, and Scheduled Payment during September through November 2018, yet Trans Union reported 120-day delinquency codes for that same period; and (c) Trans Union's own header fields report Monthly Payment = $0, Terms = "Deferred," and Pay Status = "Current Account," yet these same tradelines carry a fabricated payment date and historical delinquency codes. Trans Union's own data, in Trans Union's own systems, on Trans Union's own report,

contradicts Trans Union's own header fields. Three categories of Trans Union's own data contradict two categories of Trans Union's other data—on every one of fourteen tradelines. Information that is "technically accurate but nonetheless materially misleading" constitutes an "inaccuracy" under the FCRA. *Felts*, 893 F.3d at 1313. The FCRA "requires not just technical accuracy, but also for the report to not be misleading or incomplete." *Pedro*, 868 F.3d at 1280.

19. Under the CRRG—which Trans Union helped draft—Field 18 (Date of Last Payment) may only be populated when a corresponding non-zero payment appears in the payment history. Trans Union's own payment grid shows $0 for every month on every tradeline. Accordingly, the "Last Payment Made" field should contain no date. Trans Union populated a date in a field that Trans Union's own standard says must remain empty when no payment was received. Trans Union's deviation from its own co-authored standard "jeopardizes the integrity of the data," CRRG at 3-4, and produces a report that is "misleading or incomplete" in violation of the FCRA. *Pedro*, 868 F.3d at 1280.

20. Trans Union reported the identical fabricated date "08/26/2023" on multiple Miller tradelines despite Trans Union's own payment grid showing $0 paid across every month on every account. The identical impossible date appears on fourteen separate tradelines with fourteen separate account numbers, fourteen separate balances, and fourteen separate reporting histories—all processed by Trans Union's data systems. Trans Union's own $0 payment grid, on Trans Union's own report, proves that the payment Trans Union reported never occurred. Trans Union has offered no explanation for how this identical fabricated date was generated across fourteen separate tradelines. The replication of the same impossible date across every account is not consistent with isolated error—it is

13

consistent with systematic automated fabrication. Information that is "technically accurate but nonetheless materially misleading" constitutes an "inaccuracy" under the FCRA. *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1313 (11th Cir. 2018). A fabricated payment date accompanied by a $0 payment grid is not merely misleading—it is facially false.

21. Trans Union's own account headers for Miller's fourteen tradelines report: Monthly Payment = $0, Terms = "$0 per month for 240 months, Deferred," and Pay Status = "Current Account." Trans Union's own header fields thus establish that (a) no monthly payment is due, (b) the accounts are in deferment, and (c) the accounts are current. Yet Trans Union simultaneously reported a fabricated "Last Payment Made: 08/26/2023" date and historical 120-day delinquency codes on these same accounts. Trans Union's own header data—Monthly Payment of $0 and Deferred status—is irreconcilable with Trans Union's own "Last Payment Made" date. A payment cannot have been "made" on an account where Trans Union reports $0 is due each month. Trans Union's own report, in Trans Union's own data fields, contains three contradictions on every one of Miller's fourteen tradelines. A consumer reporting agency must not present information "in a manner that is likely to mislead." *Erickson*, 981 F.3d at 1252. The FCRA "requires not just technical accuracy, but also for the report to not be misleading or incomplete." *Pedro*, 868 F.3d at 1280. See Exhibit B-1.

F. *Dissemination of Inaccurate Consumer Reports to Third-Party Creditors*

22. Trans Union sold and disseminated consumer reports containing the fabricated data to at least the following creditors between January 2024 and June 2025, collecting fees for each report. Each dissemination constitutes a separate publication of fabricated credit

14

information to a third party, bearing a "close relationship to the harm associated with the tort of defamation." *Ramirez*, 594 U.S. at 432. Each creditor listed below appears as a Regular Inquiry on Trans Union's own consumer disclosure report (Exhibit B-1), as an adverse action notice citing Trans Union data (Exhibit M), or both:

| # | Creditor | Date | Purpose / Harm |
|---|---|---|---|
| 1 | Capital One | 01/07/2024 | Hard inquiry; fabricated data disseminated |
| 2 | NetCredit | 04/14/2024 | Personal loan; DENIED (Exhibit M) |
| 3 | Crescent Bank | 06/04/2024 | Hard inquiry; auto financing |
| 4 | Regional Acceptance | 06/04/2024 | Hard inquiry; auto financing |
| 5 | Consumer Portfolio Services | 06/04/2024 | Hard inquiry; auto financing |
| 6 | Capital One via Dealer | 06/04/2024 | Hard inquiry; auto financing |
| 7 | Ally Financial | 06/04/2024 | Hard inquiry; auto financing |
| 8 | NCC Benton Nissan | 06/04/2024 | Hard inquiry; auto financing |
| 9 | CreditFresh / First Electronic Bank | 06/19/2024 | Line of credit; DENIED (Exhibit M) |
| 10 | Stivers Ford Lincoln | 08/20/2024 | Hard inquiry; auto financing |
| 11 | Ford Credit | 08/20/2024 | Hard inquiry; auto financing |
| 12 | MRV/Vervent-Revvi | 10/24/2024 | Hard inquiry; credit card |
| 13 | TBOM/Vervent Total Visa | 12/21/2024 | Hard inquiry; credit card |
| 14 | Synovus/Verv FirstDigital | 01/10/2025 | Hard inquiry; credit card |
| 15 | Continental Finance / Bank of Missouri | 01/27/2025 | Credit card; DENIED; TU score 910 (Exhibit M) |
| 16 | Crescent Bank | 06/05/2025 | Hard inquiry; auto financing (second pull) |
| 17 | Foursight Capital | 06/05/2025 | Hard inquiry; auto financing |
| 18 | Regional Acceptance | 06/05/2025 | Hard inquiry; auto financing (second pull) |
| 19 | Ally Bank (via Opelika Ford) | 06/05/2025 | Auto loan; DENIED 06/19/2025 (Exhibit M) |

23. In each of the foregoing disseminations, Trans Union conveyed a report containing: (a) Trans Union's fabricated "Last Payment Made: 08/26/2023" on Miller's tradelines, contradicted by Trans Union's own $0 payment grids on those same tradelines; (b) historical 120-day delinquency codes for September through November 2018 on tradelines where Trans Union's own payment grid reports $0 for every monetary field—Balance, Past Due, Amount Paid, and Scheduled Payment—for that same period; and (c) header fields reporting Monthly Payment = $0, Terms = "Deferred," and Pay Status = "Current Account" alongside the fabricated payment date and delinquency codes—three internal contradictions on every tradeline. A consumer reporting agency must not present information "in a manner that is likely to mislead." *Erickson v. First Advantage Background Servs. Corp.*, 981 F.3d 1246, 1252 (11th Cir. 2020). Each dissemination conveyed a report that was misleading on its face.

24. Miller received adverse action notices from at least four creditors—NetCredit (April 14, 2024), CreditFresh (June 19, 2024), Continental Finance/Bank of Missouri (January 27, 2025), and Ally Bank (June 19, 2025)—each identifying Trans Union as a consumer reporting agency whose data was used in the credit decision. The Continental Finance/Bank of Missouri adverse action letter was based entirely on Trans Union data and reported a Trans Union score of 910. The NetCredit adverse action letter identified both "TransUnion Vantage Score" and "TransUnion Auto Origination Score" as factors adversely affecting the application. The CreditFresh adverse action letter identified TransUnion Consumer Disclosure Center as a reporting agency used in the decision. The Ally Bank adverse action letter identified TransUnion as one of four reporting agencies whose reports were used in the denial. Each adverse action constitutes concrete,

particularized injury traceable to Trans Union's fabricated reporting. See *Spokeo*, 578 U.S. at 340 (requiring "concrete" injury; injury need not be "tangible"); *Ramirez*, 594 U.S. at 432. See Exhibit M.

### G. *Failure to Follow Reasonable Procedures Under 15 U.S.C. § 1681e(b)*

To establish a claim under § 1681e(b), a plaintiff must show that: (1) the consumer report contained inaccurate information; and (2) the reporting agency failed to follow reasonable procedures to assure maximum possible accuracy. *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991). The FCRA "requires not just technical accuracy, but also for the report to not be misleading or incomplete." *Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1280 (11th Cir. 2017). Information that is "technically accurate but nonetheless materially misleading" constitutes an "inaccuracy" under § 1681e(b). *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1313 (11th Cir. 2018). A reporting agency must not present information "in a manner that is likely to mislead." *Erickson v. First Advantage Background Servs. Corp.*, 981 F.3d 1246, 1252 (11th Cir. 2020). A reporting agency's procedures are unreasonable where the agency "has a reason to believe that the information supplied to it by a data furnisher is unreliable." *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 944 (11th Cir. 2021); see also *Church v. Accretive Health, Inc.*, 654 F. App'x 990, 994 (11th Cir. 2016) (per curiam) (affirming that § 1681e(b) imposes duty of reasonable procedures even absent notice of specific error).

25. Trans Union failed to follow reasonable procedures to assure maximum possible accuracy as required by 15 U.S.C. § 1681e(b). Here, Trans Union had every reason to know its own data was unreliable—because its own payment grids contradicted its own header fields on the same tradeline. Specifically, Trans Union failed to:

17

(a) cross-reference the "Last Payment Made" header field against the payment history grid—a standard automated validation that would have detected the $0 contradiction on all fourteen accounts;

(b) detect and correct the false 120-day delinquency codes on federal student loan accounts during September through November 2018—a period when Trans Union's own payment grid reports $0 for every monetary field on those same tradelines, and Trans Union's own header fields report Monthly Payment = $0 and Terms = "Deferred"—indicating the accounts were in deferment and no payments were due;

(c) reconcile Trans Union's own header fields (Monthly Payment = $0, Terms = "Deferred," Pay Status = "Current Account") with Trans Union's own fabricated "Last Payment Made" date and historical delinquency codes on the same tradelines—three internal contradictions detectable from the face of Trans Union's own report; and

(d) conduct any meaningful reinvestigation when Miller identified these exact violations in a CFPB dispute.

Each of these failures was detectable from Trans Union's own records without reference to any external source. See *Losch*, 995 F.3d at 944 (procedures unreasonable where agency "has a reason to believe that the information supplied to it by a data furnisher is unreliable"); *Pedro*, 868 F.3d at 1280.

26. Trans Union processes credit data for approximately 200 million American consumers. Trans Union did not cross-reference the "Last Payment Made" header field against the payment history grid on any of Miller's fourteen tradelines—a standard automated validation that

would have detected the $0 contradiction on every account. Trans Union could have detected every inaccuracy on Miller's fourteen tradelines by consulting only Trans Union's own data, without reference to any external source. Where, as here, the inaccuracy is detectable from the face of the agency's own records, the failure to detect it is per se unreasonable. *Losch*, 995 F.3d at 944–45. A report containing data that is "technically accurate but nonetheless materially misleading" violates § 1681e(b) regardless of the data furnisher's input. *Felts*, 893 F.3d at 1313; see also *Pedro*, 868 F.3d at 1280 (FCRA "requires not just technical accuracy").

### H. *Failure to Conduct Reasonable Reinvestigation Under 15 U.S.C. § 1681i(a)*

Under 15 U.S.C. § 1681i(a), when a consumer disputes information in the consumer's file, the consumer reporting agency must "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate." The FCRA's investigation provisions "evince Congress's intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear grave responsibilities to ensure the accuracy of that information." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). A reinvestigation "must consist of something more than merely parroting information received from other sources," and "a reinvestigation that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.*; accord *Cortez v. Trans Union LLC*, 617 F.3d 688, 713 (3d Cir. 2010) (reaffirming *Cushman*); *Stevenson v. TRW Inc.*, 987 F.2d 288, 293 (5th Cir. 1993) ("[A] credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers.").

27. On November 25, 2025, Miller filed a dispute with the Consumer Financial Protection Bureau (CFPB Complaint No. 251125-26222119) identifying the fabricated dates, false

delinquency codes, and data integrity failures on her fourteen federal student loan tradelines. Trans Union received this dispute. Trans Union responded on January 4, 2026—forty days after receipt, exceeding the 30-day statutory deadline under § 1681i(a)(1)(A) by ten days. Trans Union "verified" the accounts as reported ("VERIFIED AS REPORTED") without correcting the fabricated dates and without removing the false delinquency codes. Trans Union "verified" this data during the pendency of active federal litigation in this Court. Trans Union received specific written notice of every fabrication alleged herein and corrected none of them. Trans Union received a written opportunity to correct its own data—supported by specific identification of the contradictions in Trans Union's own records—and returned a result that left every fabrication in place. A reinvestigation that "merely parrot[s] information received from other sources" without independent evaluation violates the statute. *Cushman*, 115 F.3d at 225. Section 1681i imposes independent obligations on consumer reporting agencies that cannot be satisfied by reliance on furnisher data alone. *Collins*, 775 F.3d at 1336. See Exhibit C.

28. In its reinvestigation, Trans Union possessed the contradictory information within its own systems: the $0 payment grid appeared alongside the fabricated "Last Payment Made: 08/26/2023" date on the same tradeline, in the same file. Trans Union "verified" the fabricated data without cross-referencing its own internal records. Trans Union did not compare the header field to the payment grid. Trans Union did not evaluate whether the 120-day delinquency codes from September through November 2018 were consistent with the $0 monetary data on its own payment grid for that same period. Trans Union did not evaluate whether its own header fields—Monthly Payment = $0, Terms = "Deferred," Pay Status = "Current Account"—were reconcilable with its own fabricated payment date

and delinquency codes. Trans Union did not independently evaluate whether the data in its own files was internally consistent. Instead, Trans Union returned a "VERIFIED AS REPORTED" result that left every fabricated date and every false delinquency code unchanged—during the pendency of active federal litigation over that exact data. Every fact Trans Union needed to identify the fabrication was present in Trans Union's own files at the time of the reinvestigation. See *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (reinvestigation that "merely parrot[s] information received from other sources" violates § 1681i); see also *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1336 (11th Cir. 2015) (holding that § 1681i imposes independent obligations on consumer reporting agencies); *Pedro*, 868 F.3d at 1280 (FCRA demands accuracy that goes beyond "technical accuracy" to encompass non-misleading presentation).

### I. *Willfulness and Reckless Disregard Under 15 U.S.C. § 1681n*

29. Trans Union's conduct satisfies the willfulness standard under *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). A consumer reporting agency acts "willfully" when it "knowingly or recklessly" violates the FCRA. *Id.* at 56–57. A violation is reckless when the agency's conduct "is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69. Willfulness is also established where a consumer reporting agency fails to follow its own internal procedures. See *Williams v. First Advantage LNS Screening Sols.*, 947 F.3d 1298, 1309 (11th Cir. 2020) (affirming $250,000 compensatory and $1 million punitive damages where agency failed to follow its own matching policy, describing compliance as "kind of

aspirational"). The following facts, taken together, establish knowing violation or reckless disregard:

(a) Trans Union reported a "Last Payment Made" date contradicted by its own payment grid—data generated by its own systems, on the same tradeline, in the same report;

(b) Trans Union reported 120-day delinquency codes on federal student loan tradelines for September through November 2018—a period during which Trans Union's own payment grid reports $0 for every monetary field on those same tradelines, and Trans Union's own header fields report Monthly Payment = $0 and Terms = "Deferred";

(c) Trans Union's own account headers report Monthly Payment = $0, Terms = "Deferred," and Pay Status = "Current Account"—yet Trans Union simultaneously reported a fabricated "Last Payment Made" date and historical delinquency codes on the same tradelines;

(d) Trans Union "verified" the fabricated and false data ("VERIFIED AS REPORTED") after Miller identified the impossibilities in a detailed CFPB dispute citing specific statutory provisions;

(e) Trans Union exceeded the 30-day statutory deadline in the reinvestigation (40 days) and failed to correct the violations;

(f) The identical fabricated date "08/26/2023" was replicated across multiple tradelines despite $0 payment grids on every account, evidencing systematic automated fabrication rather than isolated error;

22

(g) Trans Union "verified" the fabricated data during the pendency of this federal litigation; and

(h) Four United States Senators sent formal correspondence directly to Trans Union's CEO in August 2024, characterizing credit reporting agencies' student loan reporting conduct as "disgraceful" (¶9)—yet Trans Union took no corrective action on Miller's tradelines.

Trans Union has not identified any objectively reasonable interpretation of the FCRA that permits the conduct described in subparagraphs (a) through (h) above. See *Safeco*, 551 U.S. at 69 (violation is reckless where agency "ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless").

### J. *Violations of the Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1 et seq.*

30. Trans Union is a commercial enterprise that sells consumer reports as a product to creditors in exchange for fees. Trans Union sold consumer reports containing Miller's fabricated data to at least nineteen creditors between January 2024 and June 2025, as set forth in ¶22 above. Trans Union's sale of consumer reports constitutes "trade or commerce" as defined by the Alabama Deceptive Trade Practices Act ("ADTPA"), Ala. Code § 8-19-3(8). The Alabama Legislature enacted the ADTPA to provide "a strong and effective consumer protection program to protect the interest of both the consuming public and legitimate business person." Ala. Code § 8-19-2. The ADTPA is to be "construed liberally" to effectuate its protective purpose. Id. Trans Union collected payment for each report containing Miller's fabricated data.

31. Trans Union engaged in the following deceptive acts and practices in violation of Ala. Code § 8-19-5:

(a) Representing that consumer reports had characteristics, uses, and benefits they did not have—specifically, that reports were accurate and reliable when they contained fabricated "Last Payment Made" dates contradicted by Trans Union's own $0 payment grids and historical 120-day delinquency codes on tradelines where Trans Union's own monetary data reports $0 for every field, in violation of § 8-19-5(5);

(b) Representing that consumer reports were of a particular standard or quality when they were not—Trans Union's reports purported to comply with Metro 2® Format standards and FCRA accuracy requirements when they contained fabricated data and false delinquency codes, in violation of § 8-19-5(7); and

(c) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce—including reporting a fabricated "Last Payment Made" date on accounts where Trans Union's own header fields report Monthly Payment = $0 and Terms = "Deferred," "verifying" fabricated data during active federal litigation after being notified of the fabrications, exceeding statutory reinvestigation deadlines, and continuing to sell reports containing known fabrications to creditors for profit, in violation of § 8-19-5(27).

Each representation described above was contradicted by data in Trans Union's own files at the time Trans Union sold the reports. Trans Union's own data establishes that its representations were false.

32. Trans Union possessed actual knowledge that its reports contained fabricated payment dates contradicted by its own payment grids. Trans Union's own account headers report Monthly Payment = $0, Terms = "Deferred," and Pay Status = "Current Account"—three

24

header fields that are each irreconcilable with the fabricated "Last Payment Made: 08/26/2023" date on the same tradelines. Trans Union "verified" the fabricated data after Miller identified the exact impossibilities in a CFPB dispute citing specific statutory provisions. Trans Union continued selling reports containing the fabricated data to creditors during the pendency of this federal litigation. This conduct constitutes willfulness within the meaning of *Safeco*, 551 U.S. at 57, and *Williams*, 947 F.3d at 1309.

33. Trans Union collected a fee from each creditor that accessed Miller's consumer report—including at least the nineteen creditors identified in ¶22 above. Each of these reports contained the fabricated "Last Payment Made: 08/26/2023" dates and false delinquency codes on Miller's tradelines. Trans Union derived commercial benefit from the sale of each report containing fabricated data. The commercial nature of Trans Union's conduct—selling fabricated data as a product for profit while the consumer bears the consequences of that falsity—places it squarely within the ADTPA's prohibition on deceptive trade practices. Ala. Code § 8-19-5.

34. Trans Union's ADTPA liability is not preempted by the FCRA, for three independent reasons. First, Trans Union raised a preemption defense in its response opposing the First Amended Complaint (Doc. 31). The Court characterized Trans Union's preemption argument as a "passing reference" and did not adopt it. Doc. 32. Trans Union bears the burden of establishing preemption as an affirmative defense; it has not done so. Second, the FCRA's preemption provision at 15 U.S.C. § 1681h(e) does not bar state law claims where the plaintiff demonstrates "malice or willful intent to injure such consumer." As set forth in Section I above, Miller has demonstrated malice through multiple independent indicia of willfulness—fabrication of payment dates contradicted by Trans Union's own

records, verification of fabricated data during active federal litigation, and Congressional notice ignored for five years. See Cushman v. Trans Union Corp., 115 F.3d 220, 227 (3d Cir. 1997) (actions on the "same order as willful concealments or misrepresentations" satisfy malice standard). Third, § 1681h(e) by its terms applies only to actions "in the nature of defamation, invasion of privacy, or negligence." The ADTPA is none of these. The ADTPA is a statutory consumer protection scheme prohibiting deceptive commercial practices—specifically, the sale of a product (consumer reports) represented as accurate when the seller's own records establish it contains fabricated data. A claim for selling a defective product under a consumer fraud statute is categorically distinct from a claim for reputational harm under defamation law. The FCRA's qualified immunity for defamation-type claims does not extend to a state statutory scheme designed to protect consumers from deceptive trade practices. Trans Union is a Delaware limited liability company headquartered in Chicago, Illinois. Trans Union has no physical place of business in the State of Alabama. Trans Union nonetheless engaged in "trade or commerce" in Alabama by selling consumer reports containing Miller's fabricated data to Alabama creditors identified in ¶22 above, collecting fees for each report. Physical presence is not required under the ADTPA; deceptive conduct affecting Alabama consumers suffices. Ala. Code § 8-19-3(8).

## K. *Defamation Per Se Under Alabama Common Law*

35. Trans Union communicated to NetCredit on April 14, 2024, to CreditFresh on June 19, 2024, to Continental Finance/Bank of Missouri on January 27, 2025, and to Ally Bank on June 19, 2025, among others, the false statement that Miller made a payment on her student loan accounts on August 26, 2023. Miller made no such payment. Trans Union's own

payment history grid for August 2023 shows $0 paid on each tradeline. Each communication to each creditor constitutes a separate publication of a false statement of fact. See *TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13 (1990)) (publication of false credit information to third parties bears "a close relationship to the harm associated with the tort of defamation"). Trans Union's own payment history grid proved the statement was false at the time Trans Union communicated it to each creditor.

36. A fabricated "Last Payment Made" date of August 26, 2023 communicates to any creditor that Miller made a payment over a year ago and has not paid since—imputing delinquency and financial irresponsibility. Under Alabama law, a statement is defamatory per se if it injures the plaintiff in her business, trade, or profession. Ala. Code § 6-5-182. Miller is a Certified Pharmacy Technician with twenty-three years of continuous employment in the healthcare industry, including retail pharmacy, hospital intravenous technology, and insurance prior authorization. Miller served as Co-Owner and Manager of Midwest Flava LLC. Miller's professional reputation and entrepreneurial capacity depend upon financial reliability—the precise quality that Trans Union's fabricated data impugns. The publication of fabricated credit data attributing financial irresponsibility to a healthcare professional and small business owner constitutes defamation per se under Alabama law.

Because the false statements are defamatory per se, damages are presumed under Alabama law without proof of specific monetary loss. Ala. Code § 6-5-186 ("In an action for libel or slander, the plaintiff shall be entitled to recover such damages as the jury may assess."). Where a statement is defamatory per se, "the law presumes that damages have been suffered and they

need not be proved." *Delta Health Grp., Inc. v. Stafford*, 887 So. 2d 887, 898 (Ala. 2004). The jury may award compensatory damages based on the nature of the defamation, the plaintiff's standing in her profession, and the extent of publication.

37. The FCRA provides qualified immunity for defamation claims against consumer reporting agencies at 15 U.S.C. § 1681h(e), unless the plaintiff demonstrates "malice or willful intent to injure such consumer." Miller has demonstrated malice through the following facts:

(a) Trans Union fabricated a "Last Payment Made" date contradicted by its own payment grid—internal data generated by its own systems on the same tradeline;

(b) Trans Union reported 120-day delinquency codes for September through November 2018 on federal student loan tradelines where Trans Union's own payment grid reports $0 for every monetary field—Balance, Past Due, Amount Paid, and Scheduled Payment—for that same period;

(c) Trans Union's own account headers report Monthly Payment = $0, Terms = "Deferred," and Pay Status = "Current Account"—three header fields irreconcilable with the fabricated payment date and historical delinquency codes on the same tradelines;

(d) Trans Union "verified" the fabricated data ("VERIFIED AS REPORTED") after Miller identified the impossibilities in a detailed CFPB dispute citing specific statutory provisions;

(e) Trans Union exceeded the statutory reinvestigation deadline (40 days, exceeding the 30-day limit by 10 days) and failed to correct or delete any of the fabricated information;

(f) Trans Union "verified" the fabricated data during the pendency of this federal litigation; and

(g) Four United States Senators sent formal correspondence directly to Trans Union's CEO in August 2024, characterizing credit reporting agencies' student loan reporting conduct as "disgraceful" (¶9)—yet Trans Union took no corrective action on Miller's tradelines.

Trans Union has not identified any investigation, audit, or corrective measure undertaken in response to any of the foregoing. To establish malice, a defendant's actions "must be on the same order as willful concealments or misrepresentations." *Cushman*, 115 F.3d at 227. Trans Union's conduct satisfies this standard.

The combination of data fabrication, active concealment, post-notice verification, and continued publication during litigation demonstrates not merely negligence but a conscious disregard for the truth and an indifference to the harm inflicted on Miller. This satisfies the § 1681h(e) malice exception and entitles Miller to both presumed compensatory damages and punitive damages under Alabama law. Alabama imposes no statutory cap on punitive damages for intentional torts involving malice.

### L. *Summary of Damages*

38. Plaintiff alleges 295 discrete willful violations of the FCRA. Under 15 U.S.C. § 1681n(a)(1)(A), a consumer may recover "any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000." The Eleventh Circuit has held that consumers "do not have to prove actual damages in order to recover statutory damages based on alleged willful violations" of the FCRA. *Santos v. Healthcare Revenue Recovery Grp., LLC*, 90 F.4th 1144, 1154 (11th Cir. 2024) (per

curiam). Because FCRA violations "have a close relationship to the harm caused by the publication of defamatory information, a consumer does not have to prove that the false reporting caused an injury because the false reporting itself is the injury." *Id.* (citing *Ramirez*, 594 U.S. at 432). The 295 violations are as follows:

| Violation Category | Count | Rate | Amount |
|---|---|---|---|
| §1681e(b): 19 disseminations × 14 tradelines (fabricated "Last Payment Made: 08/26/2023" and false delinquency codes on each tradeline) | 266 | $1,000 | $266,000 |
| §1681i: 1 dispute — timeline violation | 1 | $1,000 | $1,000 |
| §1681i: 14 accts × 1 dispute — verification | 14 | $1,000 | $14,000 |
| §1681i: 14 accts × 1 dispute — deletion | 14 | $1,000 | $14,000 |
| FCRA STATUTORY SUBTOTAL | 295 | | $295,000 |

Plaintiff further seeks punitive damages under 15 U.S.C. § 1681n(a)(2). The Supreme Court has identified three "guideposts" for evaluating punitive damages: (1) the degree of reprehensibility; (2) the ratio of punitive to compensatory damages; and (3) comparable civil penalties. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). All three support a substantial punitive award here. First, Trans Union's conduct is highly reprehensible: it involved affirmative deception (fabrication), internal contradiction (Trans Union's own header fields contradicting its own payment date), repeated violations after notice, and indifference to Congressional warnings—the hallmarks of the "most reprehensible" conduct. *State Farm*, 538 U.S. at 419. Second, while *State Farm* instructs that "few awards exceeding a single-digit ratio" will survive due process review, a ratio approaching the single-digit maximum is warranted where, as here, the compensatory award is modest relative to the misconduct. *Id.* at 425. Third, the Eleventh Circuit has affirmed punitive awards of

30

$1 million in individual FCRA cases involving far less egregious conduct. See *Williams*, 947 F.3d at 1312 (reducing $3.3 million to $1 million—4:1 ratio). At a 7:1 ratio applied to the $295,000 statutory base, FCRA punitive damages total $2,065,000.

Plaintiff seeks treble damages under the Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-10. Treble damages for willful ADTPA violations are mandatory, not discretionary. Using the $295,000 FCRA statutory damages as the measure of actual harm, ADTPA treble damages total $885,000.

Plaintiff seeks presumed compensatory and punitive damages for defamation per se under Alabama law. As set forth in Section K above, Miller's twenty-three-year career in healthcare—a profession requiring trust, reliability, and professional standing—renders the reputational harm from Trans Union's fabricated data significant. The evidence warrants presumed compensatory damages in the range of $150,000 to $500,000. Punitive damages for defamation with malice, given the reprehensibility of the conduct, warrant an award in the range of $500,000 to $2,000,000. Alabama imposes no statutory cap on punitive damages for intentional torts involving malice.

39. Since 2024, Miller has suffered severe emotional distress, anxiety, and anguish as a direct and proximate result of Trans Union's fabricated credit reporting. Miller has experienced persistent sleep disruption, weight gain, and sustained psychological stress. Miller's family restaurant, Midwest Flava LLC—co-owned and managed by Miller from July 2024 through August 2025—was forced to close due to the inability to secure adequate financing, which was caused by Trans Union's fabricated reporting. Miller resides in rent-to-own housing because the credit scores suppressed by Trans Union's fabricated data have precluded conventional mortgage financing. Miller has been denied credit by at

least four creditors (NetCredit, CreditFresh, Continental Finance/Bank of Missouri, and Ally Bank), each of which identified Trans Union as the source of the data underlying the denial. Miller has been relegated to subprime auto financing—resulting in repeated vehicle mechanical failures—because Trans Union's fabricated data precluded standard financing terms. Each injury is traceable to Trans Union's fabricated credit reporting. See *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 503 (4th Cir. 2007) (emotional distress damages recoverable under FCRA where plaintiff demonstrates genuine injury from inaccurate reporting). See Exhibit E (Declaration of Hope R. Miller); see also Declaration of Diondre Mathis Sr. (corroborating Miller's emotional distress).

The complete damages computation, reflecting the midpoint of reasonable estimates as a good faith representation of Plaintiff's claims, is as follows:

| Damages Category | Low Estimate | High Estimate | Midpoint |
|---|---|---|---|
| FCRA Statutory (295 violations) (15 U.S.C. § 1681n(a)(1)(A), $100-$1,000 per violation) | $295,000 | $295,000 | $295,000 |
| FCRA Punitive (7:1 ratio per BMW of N. Am., Inc. v. Gore, 517 U.S. 559 (1996); State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003) (single-digit multiplier)) | $1,475,000 | $2,655,000 | $2,065,000 |
| ADTPA Treble Damages (Ala. Code § 8-19-10(a)(2), mandatory for willful violations) | $885,000 | $885,000 | $885,000 |
| Defamation Presumed Compensatory (Delta Health Grp. v. Stafford, 887 So. 2d 887 (Ala. 2004); Ala. Code § 6-5-182) | $150,000 | $500,000 | $325,000 |
| Defamation Punitive (no statutory cap; Ala. Code § 6-11-21 inapplicable to intentional torts) | $500,000 | $2,000,000 | $1,250,000 |
| Emotional Distress / Actual (Levine v. World Fin. | $75,000 | $150,000 | $112,500 |

| | | | |
|---|---|---|---|
| Network Nat. Bank, 437 F.3d 1118 (11th Cir. 2006)) | | | |
| TOTAL | $3,380,000 | $6,485,000 | $4,932,500 |

Plaintiff adopts the midpoint of the foregoing range, yielding total damages of $4,932,500. This figure reflects neither the minimum nor the maximum recoverable under the claims set forth herein, but represents Plaintiff's good faith assessment pursuant to Federal Rule of Civil Procedure 11(b)(3). All amounts remain subject to proof at trial, and Plaintiff reserves the right to seek damages up to and including the maximum supportable under each theory. This approach is consistent with the range of FCRA damages upheld by courts in this Circuit. See Williams v. First Advantage LNS Screening Solutions, Inc., No. 1:17-cv-04547 (N.D. Ga.) ($1,000,000 punitive award for less egregious single-tradeline FCRA violation); Cahlin v. General Motors Acceptance Corp., 936 F.2d 1151, 1161 (11th Cir. 1991) (affirming punitive damages where defendant acted with knowing or reckless disregard).

## COUNTS

### Count I: Willful Failure to Follow Reasonable Procedures (15 U.S.C. § 1681e(b))

Plaintiff incorporates all preceding paragraphs by reference.

40. Trans Union reported fabricated "Last Payment Made: 08/26/2023" dates on Miller's fourteen federal student loan tradelines. Trans Union's own payment grids show $0 paid for August 2023 on each of those tradelines. Trans Union reported 120-day delinquency codes for September through November 2018 on tradelines where Trans Union's own payment grid reports $0 for every monetary field. Trans Union's own header

33

fields—Monthly Payment = $0, Terms = "Deferred," Pay Status = "Current Account"—are irreconcilable with the fabricated payment date and delinquency codes on those same tradelines. Trans Union disseminated these inaccurate reports to at least nineteen creditors between January 2024 and June 2025, collecting fees for each. No objectively reasonable interpretation of the FCRA permits a consumer reporting agency to publish a "Last Payment Made" date that is contradicted by its own $0 payment grid on the same tradeline. *Safeco*, 551 U.S. at 57. The FCRA "requires not just technical accuracy, but also for the report to not be misleading or incomplete." *Pedro*, 868 F.3d at 1280. Information that is "technically accurate but nonetheless materially misleading" constitutes an inaccuracy under § 1681e(b). *Felts*, 893 F.3d at 1313. Trans Union's own $0 payment grids—generated by Trans Union's own systems, on Trans Union's own report—establish that no reasonable procedure was followed to assure maximum possible accuracy. Plaintiff seeks statutory damages of $100 to $1,000 per violation under 15 U.S.C. § 1681n(a)(1)(A), punitive damages under § 1681n(a)(2), and costs.

## Count II: Negligent Failure to Follow Reasonable Procedures (15 U.S.C. § 1681e(b)) (In the Alternative)

Plaintiff incorporates all preceding paragraphs by reference.

41. In the alternative, Trans Union negligently failed to follow reasonable procedures. Plaintiff seeks actual damages and costs under 15 U.S.C. § 1681o.

## Count III: Willful Failure to Conduct Reasonable Reinvestigation (15 U.S.C. § 1681i(a))

34

Plaintiff incorporates all preceding paragraphs by reference.

42. Miller filed a CFPB dispute identifying the fabricated dates, false delinquency codes, and data integrity failures. Trans Union received the dispute. Trans Union exceeded the 30-day statutory deadline under § 1681i(a)(1)(A)—forty days for the dispute, exceeding the deadline by ten days. Trans Union "verified" facially inaccurate data ("VERIFIED AS REPORTED") without cross-referencing its own internal records. Trans Union "verified" this data during the pendency of active federal litigation over that exact data. Trans Union did not delete any unverifiable information as required by § 1681i(a)(5)(A). The information Trans Union needed to detect and correct the fabrication was present in Trans Union's own files at the time Trans Union received the dispute. Trans Union's own $0 payment grids contradicted Trans Union's own "Last Payment Made" date on the same tradeline, in the same report, generated by the same Trans Union systems. Trans Union corrected none of them. Trans Union's reinvestigation was the paradigm of the "merely parroting" approach that *Cushman* holds violates the statute. 115 F.3d at 225. The FCRA "requires not just technical accuracy, but also for the report to not be misleading or incomplete"—an obligation that applies with equal force during reinvestigation. *Pedro*, 868 F.3d at 1280. Plaintiff seeks statutory damages, punitive damages, and costs under 15 U.S.C. § 1681n.

**Count IV: Negligent Failure to Conduct Reasonable Reinvestigation (15 U.S.C. § 1681i(a))**

**(In the Alternative)**

35

Plaintiff incorporates all preceding paragraphs by reference.

43. In the alternative, Trans Union negligently failed to conduct a reasonable reinvestigation. Plaintiff seeks actual damages and costs under 15 U.S.C. § 1681o.

### Count V: Deceptive Acts or Practices (Ala. Code § 8-19-5)

*(Ala. Code §§ 8-19-5(5), (7), and (27))*

Plaintiff incorporates all preceding paragraphs by reference.

44. Trans Union is engaged in "trade or commerce" as defined by Ala. Code § 8-19-3(8). Trans Union sells consumer reports as a commercial product to creditors in exchange for fees. Trans Union sold reports containing Miller's fabricated payment data and false delinquency codes to at least the nineteen creditors identified in ¶22 above between January 2024 and June 2025, collecting fees for each report.

45. Trans Union's conduct constitutes deceptive acts and practices prohibited by Ala. Code § 8-19-5:

   (a) Under § 8-19-5(5): Trans Union represented that its consumer reports had characteristics, uses, and benefits they did not have—namely, accuracy and reliability—when the reports contained fabricated "Last Payment Made" dates contradicted by Trans Union's own $0 payment grids and historical 120-day delinquency codes on tradelines where Trans Union's own monetary data reports $0 for every field;

   (b) Under § 8-19-5(7): Trans Union represented that its consumer reports were of a particular standard or quality—compliant with Metro 2® Format standards and

FCRA accuracy requirements—when they contained fabricated data and false delinquency codes; and

(c) Under § 8-19-5(27): Trans Union engaged in unconscionable, false, misleading, and deceptive acts including: reporting a fabricated payment date on accounts where Trans Union's own headers report Monthly Payment = $0 and Terms = "Deferred"; "verifying" fabricated data during active federal litigation after being notified of the fabrications in a CFPB dispute; exceeding statutory reinvestigation deadlines by 10 days; and continuing to sell reports containing known fabrications during active federal litigation.

Each representation described above was contradicted by data in Trans Union's own files at the time Trans Union sold the reports. Trans Union's own data establishes that its representations were false.

46. Trans Union committed 295 FCRA violations across fourteen tradelines disseminated to at least nineteen creditors. Trans Union fabricated payment dates contradicted by its own records. Trans Union reported 120-day delinquency codes for September through November 2018 on tradelines where Trans Union's own payment grid reports $0 for every monetary field. Trans Union's own account headers report Monthly Payment = $0, Terms = "Deferred," and Pay Status = "Current Account"—three header fields irreconcilable with the fabricated "Last Payment Made" date on the same tradelines. Trans Union "verified" fabricated data during active federal litigation after receiving a detailed CFPB dispute identifying the contradictions in Trans Union's own records. Four United States Senators wrote directly to Trans Union's CEO in August 2024, characterizing Trans Union's student loan reporting conduct as "disgraceful" (¶9). Trans

Union acknowledged awareness of student loan reporting failures through CDIA. Trans Union has not identified a single corrective action taken on Miller's tradelines in response to any of these events. Trans Union has not identified any investigation, audit, or corrective measure undertaken in response to any of the foregoing. Each of these facts demonstrates intentional conduct under Ala. Code § 8-19-10(a)(2), entitling Plaintiff to treble damages, actual damages, and costs.

47. This claim is not preempted by the FCRA. The Court declined to adopt Trans Union's preemption defense, characterizing it as a "passing reference." Doc. 32. The § 1681h(e) malice exception preserves state law claims where malice or willful intent to injure is demonstrated, as set forth herein. Moreover, § 1681h(e) applies by its terms only to actions "in the nature of defamation, invasion of privacy, or negligence"—the ADTPA is a statutory consumer protection scheme prohibiting deceptive commercial practices, not a defamation action. Trans Union's sale of consumer reports containing fabricated data to Alabama creditors constitutes deceptive trade or commerce in Alabama regardless of Trans Union's physical location in Chicago, Illinois. Ala. Code § 8-19-3(8). Trans Union bears the burden of establishing preemption as an affirmative defense and has failed to do so.

## Count VI: Defamation Per Se with Malice (Alabama Common Law)

*(15 U.S.C. § 1681h(e) Malice Exception)*

Plaintiff incorporates all preceding paragraphs by reference.

38

48. Trans Union communicated to NetCredit, CreditFresh, Continental Finance/Bank of Missouri, Ally Bank, and other creditors the false statement that Miller made a payment on her student loan accounts on August 26, 2023. Miller made no payment on that date or any date in August 2023. Trans Union's own payment history grid for August 2023 shows $0 paid on each tradeline, confirming the statement was false. Trans Union published as fact a payment that Trans Union's own records show never occurred. Trans Union's own $0 payment grid, on Trans Union's own report, proves that the payment Trans Union reported to each creditor never happened.

49. The false statement imputes financial irresponsibility to Miller and injures her in her business, trade, and profession. Ala. Code § 6-5-182. Trans Union's fabricated "Last Payment Made" date communicates to each creditor that Miller made a payment over a year ago and has not paid since, imputing delinquency. Miller is a Certified Pharmacy Technician with twenty-three years of continuous healthcare employment. Miller served as Co-Owner and Manager of Midwest Flava LLC. Because the false statements are defamatory per se, "the law presumes that damages have been suffered and they need not be proved." Delta Health Grp., Inc. v. Stafford, 887 So. 2d 887, 898 (Ala. 2004). Miller's professional reputation and entrepreneurial capacity have been materially impaired by Trans Union's fabricated credit data.

50. Section 1681h(e) provides that "no consumer may bring any action or proceeding in the nature of defamation . . . with respect to the reporting of information against any consumer reporting agency . . . except as to false information furnished with malice or willful intent to injure such consumer." 15 U.S.C. § 1681h(e). Trans Union acted with malice or willful intent to injure as required to overcome this qualified privilege. To

establish malice sufficient for punitive damages, a defendant's actions "must be on the same order as willful concealments or misrepresentations." *Cushman*, 115 F.3d at 227. Trans Union's conduct satisfies this standard through: (a) fabricating data contradicted by Trans Union's own internal records; (b) reporting a fabricated payment date on accounts where Trans Union's own header fields report Monthly Payment = $0, Terms = "Deferred," and Pay Status = "Current Account"—three internal contradictions on every tradeline; (c) "verifying" fabricated data ("VERIFIED AS REPORTED") after receiving a detailed CFPB dispute identifying the impossibilities; (d) exceeding the statutory reinvestigation deadline; (e) continuing to publish the fabricated data during the pendency of this federal lawsuit; (f) disregarding Congressional notice sent directly to Trans Union's CEO characterizing its student loan reporting conduct as "disgraceful" (¶9); and (g) failing to identify any investigation, audit, or corrective measure undertaken in response to any of the foregoing. The FCRA "requires not just technical accuracy, but also for the report to not be misleading or incomplete." *Pedro*, 868 F.3d at 1280. Trans Union's conduct represents precisely the type of willful concealment and misrepresentation that satisfies the § 1681h(e) malice standard.

51. Because the false statements are defamatory per se, compensatory damages are presumed under Alabama law without proof of specific monetary loss. Plaintiff further seeks punitive damages for the malicious and willful nature of Trans Union's conduct. Alabama imposes no statutory cap on punitive damages for intentional torts involving malice. The constitutional limits on punitive damages under *State Farm*, 538 U.S. at 425, are satisfied here given the extreme reprehensibility of Trans Union's conduct—fabrication,

concealment, verification of known falsity during active litigation, and continued publication.

## **PRAYER FOR RELIEF**

The material facts underlying this action are established by Trans Union's own records and are not subject to genuine dispute. Trans Union's own consumer disclosure report states "Last Payment Made: 08/26/2023" on fourteen federal student loan tradelines. Trans Union's own payment history grids show $0 paid for August 2023 on each of those tradelines. Trans Union's own account headers report Monthly Payment = $0, Terms = "Deferred," and Pay Status = "Current Account." Trans Union's own report documents nineteen hard inquiries from creditors who received the defective data. The CFPB portal confirms Trans Union received Miller's dispute on November 25, 2025, and responded forty days later—exceeding the thirty-day statutory deadline by ten days. Trans Union's own response states "VERIFIED AS REPORTED." No extrinsic evidence is required to establish any of these facts. Each is provable from documents Trans Union itself generated, published, and filed with a federal agency. Plaintiff reserves the right to move for summary judgment under Federal Rule of Civil Procedure 56 at the appropriate time on any or all claims where the undisputed material facts establish liability as a matter of law.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and award total damages in the amount of $4,932,500, comprising:

(a) Statutory damages of not less than $100 and not more than $1,000 per violation under

15 U.S.C. § 1681n(a)(1)(A);

41

(b) Punitive damages under 15 U.S.C. § 1681n(a)(2);

(c) Actual damages for lost business opportunities, business closure, and emotional distress;

(d) Treble damages under the ADTPA, Ala. Code § 8-19-10;

(e) Presumed compensatory and punitive damages for defamation per se;

(f) Pre-judgment and post-judgment interest;

(g) Reasonable attorney's fees under 15 U.S.C. § 1681n(a)(3) and Ala. Code § 8-19-10(a);

(h) Costs of this action; and

(i) Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

Respectfully submitted,

Dated: __3/3__, 2026

_Hope Miller_

**HOPE R. MILLER, Pro Se Plaintiff**
404 Brown Street

42

Tuskegee, Alabama 36083
Email: ybtheknight@gmail.com
Telephone: (334) 938-9171

43

## UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF ALABAMA

_____ **DIVISION**

## <u>CERTIFICATE OF SERVICE</u>

I, Hope R. Miller, do hereby Certify that a true and correct copy of the foregoing has been furnished by email (manner of service, i.e., U.S. Mail, electronic mail, etc.) on this _2_ day of March _____ 2026, to:

James Allen Sydnor, Jr.
Asydnor@huielaw.com

William Thomas Thompson
wthompson@huielaw.com

_3/2/26_____        _Hope Miller_____

Date                                             Signature