IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

HOPE R. MILLER,

Plaintiff,

v.

TRANS UNION LLC,

Defendant.

Case No. 3:25-cv-00623-RAH-CWB

## EXHIBIT E

## PLAINTIFF IMPACT STATEMENT
## AND CORROBORATING DECLARATION

### Declaration 1:

Hope R. Miller, CPhT, A.S.

Certified Pharmacy Technician — 23 Years of Continuous Healthcare Employment

Co-Owner & Manager of Administration, Midwest Flava LLC (July 2024 — August 2025)

### Declaration 2:

Diondre Mathis Sr.

Domestic Partner of Plaintiff — Corroborating Witness

Former Correctional Officer & Counselor Supervisor, Dallas County Juvenile Detention Center

Youth and Family Counselor, Brant Center

Special Needs Residential Aide, Bridges of Wisconsin

*Filed pursuant to the Court's Order dated February 19, 2026 (Doc. 32)*

*Two sworn declarations under 28 U.S.C. § 1746*

# DECLARATION OF HOPE R. MILLER, CPhT, A.S.

Pursuant to 28 U.S.C. § 1746

I, Hope R. Miller, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following statements are true and correct to the best of my knowledge, information, and belief:

## I. Professional Background and Qualifications

I am a Certified Pharmacy Technician ("CPhT") with twenty-three years of continuous employment in the healthcare industry, beginning in 2003. I hold an Associate's Degree in Computer Technology from the University of Phoenix, conferred in 2012.

Over the course of my career, I have served in the following positions:

(a) Retail Pharmacy Technician, Walgreens;

(b) Senior Intravenous (IV) Technician, DCH Regional Medical Center;

(c) Data Entry Technician, Prime Therapeutics;

(d) Insurance Prior Authorization Specialist, Select Quote;

(e) Pharmacy Technician, Pipeline Healthcare;

(f) Pharmacy Technician, Polaris RX; and

(g) Healthcare Operations, Oscar Healthcare.

My professional responsibilities across these positions have included the compounding and dispensing of pharmaceutical products, the preparation of sterile intravenous admixtures, the processing of insurance prior authorizations, and the accurate management of patient medication records. These duties require sustained precision, clinical vigilance, and the professional capacity to identify adverse pharmaceutical reactions, physiological stress responses, and indicators of patient distress. I have exercised these competencies continuously for over two decades. The same observational and diagnostic skills that I apply to patient care inform the assessment of my own emotional and psychological condition as set forth in Section IV below.

## II. Business Ownership and Destruction

From July 2024 to August 2025, I served as Co-Owner and Manager of Administration for Midwest Flava LLC, a family restaurant business I operated with my domestic partner, Diondre Mathis Sr. The business was organized under the laws of the State of Alabama, with a Certificate of Formation filed with the Office of the Secretary of State on January 9, 2025. See Exhibit M (formation documents and commercial lease agreement).

The restaurant operated for thirteen months before it was forced to close in August 2025. The closure was a direct and proximate consequence of the inability to secure adequate financing. That inability was caused, in whole or in material part, by the credit scores suppressed by Trans Union's fabricated reporting on my consumer file. Higher credit scores—scores that would have existed absent Trans Union's fabricated data—would have enabled access to more favorable financing terms, greater working capital, and a reasonable opportunity to sustain the business through its critical first year of operations. The destruction of Midwest Flava LLC represents a concrete, quantifiable economic injury directly traceable to Trans Union's conduct.

### III. Housing and Transportation Harm

My family and I currently reside in rent-to-own housing at 404 Brown Street, Tuskegee, Alabama 36083. We maintain a large household and require adequate space. The property is situated adjacent to public housing. This was the most favorable housing arrangement available to us at the credit scores suppressed by Trans Union's fabricated data. Conventional mortgage financing and standard rental agreements were not available to us. The difference between rent-to-own terms and conventional mortgage terms represents an ongoing, recurring financial injury that accrues with each monthly payment.

In seeking to finance vehicles, I have been limited exclusively to subprime auto financing as a direct consequence of the credit scores suppressed by Trans Union's fabricated data. I have experienced multiple vehicle mechanical failures and incurred substantial repair expenses as a result of the subprime-quality vehicles I was compelled to purchase. The financing obligations on those vehicles continue irrespective of their mechanical condition. Each vehicle breakdown, each repair expense, and each inflated interest payment is traceable to the suppressed credit scores produced by Trans Union's fabricated reporting.

### IV. Emotional Distress and Psychological Harm

I have spent twenty-three years in a profession that requires the recognition and assessment of distress in others. As a Certified Pharmacy Technician, I have observed adverse pharmaceutical reactions—including anaphylaxis, drug interactions, and medication non-compliance symptoms—that require immediate identification of physiological and psychological distress indicators. As a Senior IV Technician at DCH Regional Medical Center, I prepared sterile intravenous admixtures for critically ill patients and was required to monitor for infusion-related adverse reactions, which manifest through the same physiological stress responses—elevated anxiety, sleep disruption, appetite changes, and affective dysregulation—that I now observe in my own condition. As an Insurance Prior Authorization Specialist, I routinely encountered patients in acute distress upon learning that their prescribed medications had been denied, and I was trained to identify and de-escalate that distress as part

of standard patient care. The recognition of stress responses is not ancillary to my profession—it is integral to competent pharmaceutical care and has been integral to every position I have held for twenty-three years. I apply that professional framework to the assessment of my own condition as follows.

Since discovering the scope of Trans Union's fabricated reporting on my consumer file, I have experienced persistent and severe emotional distress, including:

(a) Recurring episodes of crying unrelated to any pre-existing condition and directly precipitated by encounters with Trans Union's fabricated data, adverse action correspondence, and the financial consequences of suppressed credit scores;

(b) Significant weight gain attributable to sustained psychological stress, consistent with the physiological stress-response patterns I have observed professionally in patients experiencing chronic distress;

(c) Persistent sleep disruption, including difficulty initiating sleep, nocturnal waking, and waking in a state of acute anxiety—a pattern I recognize from my clinical training as among the most reliable indicators of sustained emotional harm;

(d) Ongoing anxiety regarding my financial future and the welfare of my children and household, manifesting as hypervigilance toward credit-related correspondence, repeated review of my credit file, and acute distress upon each encounter with the fabricated data;

(e) Anger and frustration upon discovering the scope of the fabrication—that a consumer reporting agency of Trans Union's size and market position published internally contradictory data for years and then "verified" that data as accurate after being confronted with its own contradictions; and

(f) A pervasive sense of institutional betrayal—the recognition that the systems governing access to credit, housing, and financing operated not with the integrity I bring to my profession, but with reckless disregard for the accuracy of the data they published about me.

These symptoms are not transient. They have persisted since I first became aware of Trans Union's fabricated data and have intensified as the full scope of the harm—the business closure, the four documented credit denials, the substandard housing, the subprime vehicle financing—has become apparent. Based on twenty-three years of professional experience identifying physiological and psychological distress indicators in clinical and patient-care settings—including the identification of adverse drug reactions, infusion-related stress responses, and medication denial distress—I attest that the emotional harm I have experienced is genuine, sustained, and directly attributable to Trans Union's fabricated credit reporting. This is not a lay opinion offered without basis. It is the informed assessment of a healthcare professional who has spent over two decades identifying the same physiological and

psychological stress indicators in patients that she now recognizes in herself.

## V. Documented Credit Denials

I have received adverse action notices from at least four creditors, each identifying Trans Union as a consumer reporting agency whose data was used in the credit decision:

(a) NetCredit — denied April 14, 2024; cited TransUnion VantageScore and TransUnion Auto Origination Score;

(b) CreditFresh / First Electronic Bank — denied June 19, 2024; cited TransUnion Consumer Disclosure Center;

(c) Continental Finance / The Bank of Missouri — denied January 27, 2025; based entirely on Trans Union data; Trans Union credit score reported as 910; and

(d) Ally Bank (via Opelika Ford, Inc.) — denied June 19, 2025; identified TransUnion as one of four reporting agencies used in the denial.

Each of these denials is documented in Exhibit M. Each identifies Trans Union by name. Each represents a concrete, particularized injury traceable to Trans Union's fabricated credit reporting. The Continental Finance denial is of particular significance: Trans Union's own scoring system processed Trans Union's own fabricated data and produced a score of 910 that formed the basis for the denial. Trans Union's own fabrication generated Trans Union's own score that caused Trans Union's own customer to deny credit to Miller.

*I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.*

Executed on ___3/2___, 2026

At Tuskegee, Macon County, Alabama

*Hope Miller*

**HOPE R. MILLER, Pro Se Plaintiff**
Certified Pharmacy Technician (CPhT)
Associate's Degree, Computer Technology (2012)
23 Years of Continuous Healthcare Employment

# CORROBORATING DECLARATION OF DIONDRE MATHIS SR.

Pursuant to 28 U.S.C. § 1746

I, Diondre Mathis Sr., hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following statements are true and correct to the best of my knowledge, information, and belief:

## I. Professional Background and Qualifications to Observe Emotional Harm

I have dedicated my professional career to the observation, assessment, and rehabilitation of individuals experiencing acute psychological distress, behavioral crisis, and emotional deterioration. My training and experience span three distinct disciplines—special needs behavioral support, juvenile corrections and counseling, and youth and family therapeutic services—each of which required formal competency in identifying, documenting, and responding to signs of emotional harm in individuals who frequently mask or suppress their distress.

My professional positions include:

(a) **Special Needs Residential Aide, Bridges of Wisconsin, Milwaukee, Wisconsin.** In this capacity, I provided direct behavioral support to individuals with specialized needs requiring structured residential care. My duties included continuous behavioral observation, crisis intervention, incident documentation, and the identification of changes in emotional and psychological baseline functioning. This position required formal training in the recognition of distress indicators that are not verbally communicated—behavioral cues, physiological changes, and affective shifts that are detectable only through sustained, trained observation.

(b) **Correctional Officer and Counselor Supervisor, Dallas County Juvenile Detention Center, Selma, Alabama.** I served under Director Marcus Hannah, a military veteran, overseeing daily operations at Camp Perry Varner Education and Treatment Facility. This facility achieved eight consecutive years of perfect 100% audit scores from the Alabama Department of Youth Services—the only juvenile facility in the State of Alabama to attain this distinction during the relevant period. Those audits evaluated, among other criteria, the quality of behavioral assessments, the accuracy of incident documentation, the adequacy of emotional crisis intervention protocols, and the competency of counseling staff under my supervision. The fact that the facility achieved perfect scores for eight consecutive years under my supervisory oversight means that the State of Alabama repeatedly examined and validated the very observational, assessment, and documentation methodologies that I apply to my observations of Hope R. Miller in this declaration. My responsibilities at Camp Perry

Varner included individualized behavioral assessment, emotional crisis management, counseling, incident reporting, and direct supervisory oversight of counseling staff. I was trained to identify subtle indicators of psychological distress in populations that routinely mask emotional harm—including withdrawal, irritability, appetite changes, sleep disturbance, and affective dysregulation. These are the same indicators I have observed in Hope R. Miller as set forth in Section III below.

**(c) Youth and Family Counselor, Brant Center (under David Brantley, military veteran and facility owner).** My responsibilities included direct therapeutic engagement with youth and families in crisis, behavioral assessment, and the documentation of emotional and psychological changes over time. This position required the professional capacity to distinguish between performative expressions of distress and genuine, sustained emotional harm—a distinction I have been trained to make and have made professionally throughout my career.

The aggregate of this training and experience—spanning behavioral support for special needs populations, correctional counseling and crisis management for juvenile offenders, and therapeutic services for families in crisis—qualifies me to observe, identify, and attest to signs of emotional distress, psychological deterioration, and sustained behavioral change. Critically, my observational and assessment methodology is not merely self-reported—it was examined and validated by the Alabama Department of Youth Services through eight consecutive annual audits, each of which resulted in a perfect 100% score. No other juvenile facility in the State of Alabama achieved this record during the relevant period. The State of Alabama has, in effect, certified the reliability of the behavioral assessment and documentation practices I apply to the observations set forth in this declaration.

## II. Relationship to Plaintiff and Basis of Observation

Hope R. Miller is my domestic partner and the mother of our children. We reside together at 404 Brown Street, Tuskegee, Alabama 36083, along with our children and extended family members. I have lived with Miller and observed her on a daily and continuous basis throughout the entire period relevant to this litigation. My observations are not intermittent or occasional—they are the product of sustained, daily, in-home contact with the Plaintiff over a period of years.

From July 2024 to August 2025, I served as Co-Owner, Manager, and Cook at Midwest Flava LLC, the family restaurant that Miller and I built and operated together. I witnessed firsthand the operational demands of the business, the financing applications that were submitted, the credit-based obstacles that were encountered, and the role that Trans Union's fabricated credit data played in the inability to secure the financing necessary to sustain the enterprise. I was present for the closure of the business. I observed its effect on Miller.

### III. Observations of Plaintiff's Emotional and Psychological Harm

Drawing on my professional training in behavioral assessment and crisis identification, and on my sustained daily personal observation of Hope R. Miller, I have identified the following indicators of genuine, sustained emotional and psychological harm in the Plaintiff throughout the period relevant to this litigation:

(a) **Recurring episodes of crying.** I have observed Miller experience involuntary crying episodes with increasing frequency since she became aware of the fabricated data on her Trans Union consumer file. These episodes are not situational or performative. They occur in contexts consistent with genuine psychological distress—upon reviewing financial documents, upon receiving credit denials, and during unrelated daily activities when the cumulative burden manifests without external trigger. In my professional experience, involuntary crying unrelated to immediate situational stressors is a recognized indicator of chronic emotional distress.

(b) **Significant weight gain attributable to sustained stress.** I have observed a marked change in Miller's physical condition since the commencement of this matter. In my professional experience working with individuals under sustained psychological pressure in correctional and therapeutic settings, stress-related weight fluctuation—particularly weight gain—is a recognized physiological indicator of chronic emotional distress. The change I have observed in Miller is consistent with this established pattern.

(c) **Persistent sleep disruption.** As Miller's domestic partner, I am in a position to observe her sleep patterns directly and continuously. Miller has experienced significant and ongoing sleep disruption, including difficulty initiating sleep, nocturnal waking, and waking in a state of evident anxiety. In my professional training across all three disciplines, sleep disturbance is among the most reliable early indicators of sustained emotional harm and is frequently the first observable symptom of chronic psychological distress.

(d) **Anxiety and hypervigilance regarding financial matters.** Miller has exhibited a marked increase in anxiety specifically related to credit, financing, and financial stability. I have observed her re-read adverse action letters, review her credit file repeatedly, and express acute distress upon each encounter with the fabricated data. This behavioral pattern is consistent with trauma-associated hypervigilance—a behavioral indicator I have been trained to identify in my professional work with populations experiencing sustained institutional harm.

(e) **Devastation upon the closure of Midwest Flava LLC.** I witnessed the closure of our family restaurant firsthand. Miller invested substantial personal effort, administrative labor, time, and financial resources into that enterprise. Its closure

compounded an already severe emotional burden. The realization that the business might have survived with accurate credit reporting—and that it was destroyed, in material part, by Trans Union's fabricated data—has been a source of profound and sustained grief that I have observed on a daily basis.

Miller is a Certified Pharmacy Technician with twenty-three years of continuous healthcare employment. She has spent her career in clinical environments that demand composure, precision, and emotional regulation under pressure. She is not an individual who expresses distress readily, exaggerates her circumstances, or seeks sympathy. In my professional assessment—informed by years of formal training in behavioral observation, emotional crisis identification, and psychological assessment across three distinct clinical and correctional disciplines, and validated by eight consecutive years of perfect state audit scores attesting to the reliability of my assessment methodology—the distress I have observed in Miller is genuine, severe, sustained, and materially different from the emotional baseline I have known in her throughout our relationship. The change is not subtle. It is pronounced, persistent, and directly correlated with the events giving rise to this litigation.

## IV. Professional Assessment and Attestation

Based on the totality of my professional training in behavioral assessment, emotional crisis identification, and psychological observation—training acquired across three distinct disciplines over the course of my career and validated by eight consecutive years of perfect 100% audit scores from the Alabama Department of Youth Services—and based on my sustained daily personal observation of Hope R. Miller over the entire period relevant to this litigation, I attest to the following:

(a) The emotional and psychological harm Miller has suffered as a result of Trans Union's fabricated credit reporting is real, substantial, and ongoing.

(b) The harm is not exaggerated, performative, or contrived.

(c) The behavioral and physiological indicators I have observed—recurring crying episodes, significant weight gain, persistent sleep disruption, financial hypervigilance, and sustained grief—are consistent with genuine, chronic emotional distress caused by external institutional harm.

(d) The harm has been compounded by the destruction of a family business, four documented credit denials each naming Trans Union, relegation to rent-to-own housing adjacent to public housing, and confinement to subprime vehicle financing—each of which is directly traceable to Trans Union's fabricated credit reporting.

(e) In my professional judgment, the emotional harm Miller has experienced represents a material and lasting change in her psychological condition that is directly and proximately caused by Trans Union's conduct as alleged in the Second Amended

Complaint.

*I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.*

Executed on **March 2**, 2026
At Tuskegee, Macon County, Alabama

**DIONDRE MATHIS SR.**
Corroborating Witness — Domestic Partner of Plaintiff
Former Correctional Officer & Counselor Supervisor
Dallas County Juvenile Detention Center, Selma, Alabama
Youth and Family Counselor, Brant Center
Special Needs Residential Aide, Bridges of Wisconsin